# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 47703

MARY CLARE GRIFFIN, individual, and as parent and guardian of her minor child, G.G; and G.G., a minor child, by and through his parent and guardian, Mary Clare Griffin,

    Plaintiffs-Appellants,

v.

STE. MICHELLE WINE ESTATES LTD., a Washington corporation; MARCHESI ANTINORI S.R.L., a foreign societa responsabilita limitata; ZIGNANO VETRO S.P.A., a foreign societa per azioni,

    Defendants-Respondents,

and

ALBERTSON'S LLC, a Delaware limited liability company; S & C IMPORTERS AND DISTRIBUTORS, INC., dba S&C WINES, an Idaho corporation; and DOES I through X,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Boise, February 2021 Term

Substitute Opinion filed: July 19, 2021

SUBSTITUTE OPINION. THE COURT'S PRIOR OPINION DATED APRIL 14, 2021, IS HEREBY WITHDRAWN.

Melanie Gagnepain, Clerk

---

Appeal from the District Court of the Fifth Judicial District of the State of Idaho, Blaine County. Ned C. Williamson, District Judge.

The judgment of the district court is <u>affirmed in part</u> and <u>reversed and remanded in part</u>.

Powers Farley, PC, Boise, for Appellants. Donald Farley argued.

DLA Piper LLP (US), Seattle, for Respondents Ste. Michelle Wine Estates LTD and Marchesi Antinori S.R.L. Anthony Todaro argued.

Quane Jones McColl, PLLC, Boise, for Respondent Zignano Vetro S.P.A. Brendan T. Fitzpatrick argued.

---

1

MOELLER, Justice.

This case, involving international parties and addressing fundamental questions of jurisdictional law, stems from an unfortunate kitchen accident. Mary Clare Griffin purchased a bottle of Italian wine, which broke in her hands as she attempted to open it, causing substantial injuries. Griffin and her son,[1] a minor who witnessed the event, brought a product liability suit against Zignago Vetro S.P.A. (Zignago), the Italian manufacturer of the wine bottle; Marchesi Antinori SRL (Antinori), the Italian wine company that purchased the bottle from Zignago, filled it with wine, and exported it to the United States; Chateau Ste. Michelle Wine Estates, Ltd. (Ste. Michelle), the United States importer; S & C Importers and Distributors, Inc. (S&C), the Idaho distributor who purchased the bottle from Ste. Michelle; and, Albertson's LLC (Albertson's), the retailer that sold the bottle to Griffin.

Zignago successfully moved the district court to dismiss Griffin's complaint based on a lack of personal jurisdiction. Griffin appeals the district court's decision, asking this Court to apply the personal jurisdiction framework established by the United States Supreme Court in *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980). Zignago asserts that the district court did not err by applying the stricter test that the United States Supreme Court offered in *Asahi Metal Indus. Co. v. Superior Court of California, Solano Cnty.*, 480 U.S. 102 (1987) (plurality). Griffin also appeals the district court's order granting summary judgment to Antinori and Ste. Michelle on the grounds that Griffin failed to meet her burden to show a *prima facie* case for a product liability claim. Additionally, Griffin appeals several adverse discovery rulings. S&C and Albertson's are not parties to this appeal.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

On October 5, 2017, Mary Clare Griffin purchased a 2011 Villa Antinori Chianti Classico D.O.C.G. Riserva bottle of wine (hereinafter "the bottle") from Albertson's grocery store in Hailey, Idaho. Griffin is a professional chef who provides cooking services to individuals and entities in Idaho. She purchased the wine to use in making tomato sauce for her clients. The day after purchasing the bottle, Griffin used a corkscrew to open it. For purposes of the appeal, it is undisputed that a defect in the neck of the bottle caused it to fracture, break, and severely injure Griffin's left hand when she attempted to open it.

---

[1] For ease of reference, Griffin will be referred to in the singular throughout this opinion.

Zignago manufactured the glass bottle that caused injury to Griffin. Zignago is a foreign limited liability company that operates in Italy, but also engages in international trade. Zignago sold many of its manufactured bottles to Antinori. Antinori is an Italian wine company that produces a variety of wines, including a product known as "Villa Antinori Chianti Classico Riserva." From 2008 to June 30, 2018, Antinori purchased over 92 million wine bottles from Zignago. During the same time period, Antinori exported over 43 million bottles of wine to the United States. Since 2013, Ste. Michelle, acting as an exporter, has shipped 1,308 bottles of Villa Antinori Chianti Classico Riserva to various Idaho distributors, in bottles manufactured by Zignago and filled by Antinori. One of those distributors, S&C, sold 138 bottles of Villa Antinori Chianti Classico Riserva to Idaho customers and consumers between January 1, 2013, and August 31, 2018. One of those customers was Albertson's. From October of 2015 to September of 2018, Albertson's sold 289 bottles of Villa Antinori Chianti Classico Riserva wine.

Antinori and Zignago have an agreement for the supply of the wine bottles. Their agreement discusses the details of the relationship and the product to be purchased. Before entering the agreement, Zignago acknowledges it discussed the markets in which Antinori operates with Antinori. The agreement requires each bottle to have a special label for tracing. Antinori confirmed the bottle that caused Griffin's injuries was manufactured by Zignago.

Zignago maintains a website that is accessible in Idaho. The website shows Zignago's products and specifications, including a bottle identical to the one at issue in this case. However, the website does not direct advertisements to the United States or Idaho. Individuals cannot purchase products from the website and no products have been directly sold from the website. Those who visit the website do not have to provide personal information.

**B. Procedural History**

Griffin's complaint alleged seven causes of action: (1) strict liability, (2) negligent design, (3) negligent manufacture, (4) failure to warn, (5) negligence, (6) breach of express warranty, and (7) breach of implied warranty. Griffin alleged that Zignago and Antinori "designed, produced, manufactured, bottled, assembled, packaged, sold, shipped, and/or caused to be imported into the United States of America . . . a bottle of wine known as and labeled Villa Antinori Chianti Classico D.O.C.G. Riserva 2011." Griffin alleged that Ste. Michelle imported the bottle to the United States, which was later sold to S&C and then to Albertson's, which sold the bottle to Griffin. Griffin further alleged that the defect in the bottle was caused by the design,

3

manufacture, or filling of the bottle and was present at the time the bottle left Zignago's or Antinori's possession. Griffin complained that the defect in the bottle caused her injury, resulting in severe and permanent damage. In order to satisfy personal jurisdiction, Griffin alleged that Zignago and Antinori placed the bottle within the stream of commerce and knew or should have known that the bottle would reach Griffin, or a similarly situated individual, in Idaho.

Zignago made a special appearance to contest the district court's personal jurisdiction on May 23, 2018. Zignago moved the district court to quash Griffin's service and/or dismiss the action under Idaho Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction.[2] Griffin opposed Zignago's motion and requested the district court to stay the hearing on Zignago's motion to dismiss in order to allow Griffin to conduct jurisdictional discovery. Griffin also requested to depose Zignago's Chief Financial Officer, Roberto Celot, in Idaho. Griffin asserted that because Celot submitted an affidavit with Zignago's motion to dismiss that stated, "I am submitting myself to the jurisdiction of the State of Idaho as it relates to this declaration," that Celot submitted to Idaho's jurisdiction and Griffin should be able to depose him.

The district court denied Griffin's request to depose Celot in Idaho. It reasoned that Celot filed a declaration and made a special appearance to contest personal jurisdiction – a reasonable and common action for a foreign individual or company. However, it would be unreasonable to compel the declarant to be deposed in the jurisdiction before the district court determined whether it had personal jurisdiction. The district court further rejected Griffin's argument that Celot's language in his declaration fully submitted him to jurisdiction in Idaho; the statement in the affidavit was only made to indicate that Celot was submitting to jurisdiction as it related to the special appearance.

On October 22, 2018, the district court issued a written decision on Griffin's motion to compel discovery and granted Griffin's motion to stay Zignago's hearing on its motion to dismiss. In order to determine the limitations of discovery, the district court conducted a preliminary analysis on personal jurisdiction over Zignago. In its motion, Zignago did not contend that its actions fell outside the reach of Idaho's long-arm statute. Instead, Zignago focused on the other aspect of personal jurisdiction, arguing that it was against the constitutional standards of due process to exercise personal jurisdiction over it.

---

[2] Zignago moved for dismissal pursuant to Idaho Rule of Civil Procedure 12(b)(2), (4), and (5); however, only the district court's ruling regarding Rule 12(b)(2) ("lack of personal jurisdiction") has been raised on appeal.

4

The district court reviewed the history of personal jurisdiction jurisprudence, commencing with *Pennoyer v. Neff*, 95 U.S. 714 (1877), and continuing through *Int'l Shoe Co. v. Washington*, 326 U.S. 310, (1945), *Hanson v. Denckla*, 357 U.S. 235 (1958), *Shaffer v. Heitner*, 433 U.S. 186 (1977), *World-Wide Volkswagen v. Woodson*, 444 U.S. 286 (1980), *Asahi Metal Indus. Co., Ltd. v. Superior Ct. of California, Solano Cnty.*, 480 U.S. 102 (1987), and, *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873 (2011). The district court noted that *World-Wide Volkswagen* employed the "stream of commerce" test, which allowed personal jurisdiction to be exercised when a defendant places a product within the stream of commerce with an awareness that the product would be sold in the forum state. On the other hand, the district court observed that the plurality in *Asahi* pushed for a stricter constitutional test, known as the "stream of commerce *plus*" test, which required a defendant to purposefully direct actions at the forum state in order to be haled into court there, rather than merely placing a product into the stream of commerce.

The district court also correctly noted that Idaho employs the "narrowest grounds analysis" for interpreting U.S. Supreme Court decisions, which is, " '[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.' " *State v. Wass*, 162 Idaho 361, 366, 396 P.3d 1243, 1248 (2017) (quoting *Marks v. United States*, 430 U.S. 188, 193 (1977)). Since no Idaho appellate court had previously performed a narrowest-grounds analysis on either *Asahi* or *J. McIntyre*, the district court turned to Colorado, which performed a narrowest-grounds analysis on *Asahi* and *J. McIntyre* in *Align Corp. Ltd. v. Allister Mark Boustred*, 421 P.3d 163 (Colo. 2017), *cert. denied*, 138 S.Ct. 2623 (2018). Colorado employs the same narrowest grounds analysis as Idaho and uses the same two-part test for personal jurisdiction: whether the defendant's conduct falls within the State's long-arm statute and whether exercising jurisdiction does not violate the defendant's constitutional due process rights. *Align*, 421 P.3d at 167, 170.

Although the Colorado Supreme Court in *Align* concluded that the majority opinion in *World-Wide Volkswagen* represented the narrowest grounds of the concurrences in *Asahi and J. McIntyre*, the district court rejected this approach. Instead, it reasoned:

> Despite the narrowest grounds analysis by the Colorado Supreme Court in *Align*, this Court believes the "stream of commerce *plus*" test is the appropriate test to apply in a specific jurisdiction case. Admittedly, the Idaho Supreme Court

observed that personal jurisdiction shall be liberally construed (*Doggett* at 31, 454 P.2d at 68) and found that personal jurisdiction may be based on a singular act (*see e.g., Doggett*, 93 Idaho 26, 454 P.2d 63 and *Duignan*, 98 Idaho 134, 559 P.2d 750). But, these Idaho Supreme Court decisions preceded *World-Wide Volkswagen*.

At the end of the day, the federal evolution towards a stricter personal jurisdiction standard, Justice Breyer's concurrence in *J. McIntyre* and the requirements of additional acts in *Schneider*[3] *and Profits Plus*[4] tip the scale in favor of the "stream of commerce *plus*" test. . . . In the concurrence in *J. McIntyre* (which represents the narrowest grounds of the *Asahi* decision), Justice Breyer wrote '[n]one of our precedents finds that a single isolated sale, even if accompanied by the kind of sales effort indicated here, is sufficient.' *J. McIntyre* at 887, 131 S.Ct. at 2791. *Schneider and Profits Plus* also demonstrate a singular act is not sufficient for personal jurisdiction. *Profits Plus* held that a contract alone was not enough to establish personal jurisdiction and instead required another act(s) such as 'prior negotiations, contemplated future consequences, the terms of the contract, and the parties' actual course of dealing.' *Id.* at 884, 332 P.3d at 796. These additional acts are similar to acts which can establish specific personal jurisdiction, such as designing, advertising, marketing, establishing channels for advice to customers, attendance at trade shows, maintenance of an office, employing employees and/or creating, controlling or employing a distribution system. *J. McIntyre* at 890, 131 S.Ct. 2792; *Align Corporation Limited* at 169. For these reasons, the Court concludes that specific personal jurisdiction can be established in this case by a "stream of commerce *plus*" test.

The district court then ordered Zignago to comply with certain jurisdictional discovery requests by Griffin, consistent with conducting a "stream of commerce *plus*" analysis, and granted Griffin's request to stay Zignago's motion to dismiss pending discovery.

After the district court permitted almost one year for additional jurisdictional discovery, it rendered its decision regarding Zignago's motion to dismiss on February 4, 2019. In its analysis, the district court addressed the motion to dismiss for lack of personal jurisdiction under the "stream of commerce *plus*" test. The district court determined that Zignago, other than selling its bottles to a company that did business in the United States, directed no additional acts toward Idaho as required by the "stream of commerce *plus*" test. It reasoned, that although Zignago is a large manufacturer of bottles, Zignago did not design its bottles for the Idaho market, advertise in Idaho, establish channels for providing regular advice to Idaho consumers, employ distributors as sales agents in Idaho, operate an office in Idaho, own or lease property in Idaho, or send

---

[3] *Schneider v. Sverdsten Logging Co., Inc.*, 104 Idaho 210, 657 P.2d 1078 (1983).
[4] *Profits Plus Capital Mgmt., LLC v. Podesta*, 156 Idaho 873, 332 P.3d 785 (2014).

employees to Idaho for any reason. The district court also rejected Griffin's argument that Zignago's web presence established minimum contacts to satisfy the "stream of commerce *plus*" standard. The district court rationalized that Zignago's website was a mere web presence and it was passive; it did nothing to encourage residents of Idaho to use it and it was not interactive with users because the website did not exchange any personal information with visitors. The website simply provided information about Zignago's products, and a passive website is insufficient to satisfy personal jurisdiction. Therefore, because Zignago merely placed bottles into the stream of commerce, had a passive website, and did not take an additional targeted step directed at Idaho, the district court held that Griffin had not established minimum contacts to satisfy the "stream of commerce *plus*" test. The district court granted Zignago's motion to dismiss because Idaho could not assert personal jurisdiction over Zignago.

Griffin continued to exchange discovery with Antinori and Ste. Michelle. Griffin filed her first set of discovery requests with Antinori and Ste. Michelle on May 15, 2018, her second set of requests on July 10, 2018, her third set of requests on August 13, 2018, and then finally, Griffin filed a fourth set of requests on June 28, 2019. On July 22, 2019, Antinori and Ste. Michelle filed a motion for summary judgment, arguing that Griffin's evidence of liability was speculative and Griffin could not establish causation to maintain a product liability claim. Griffin opposed the motion. Griffin argued that in order to establish a *prima facie* case of product liability, all she had to show was: (1) injury; (2) the product was defective; and, (3) the defect existed when it left the control of the manufacturer. *Farmer v. Int'l Harvester Co.*, 97 Idaho 742, 746-47, 553 P.2d 1306, 1310-11 (1976). However, because direct evidence in product liability cases is rare, Griffin asserted that she could also establish a *prima facie* case through circumstantial evidence of a defect. This alternative theory required Griffin to show: (1) malfunction of the product; (2) lack of evidence of abnormal use; and (3) proof excluding the possibility of other reasonable causes. *Id.* at 747, 553 P.2d 1311.

Griffin relied on an expert opinion from Jim Goldman to show there was a defect and to eliminate other reasonable causes.[5] Goldman is a glass packaging engineer and certified packing professional. He prepared a report centered on a fracture analysis of the bottle, and noted his experience as a packing engineer, his experience in glass fracture, and his experience in supply

---

[5] Griffin retained another expert, Jim Del Ciello, but Griffin did not submit his report at summary judgment and the district court explicitly noted that it was not considered. Therefore, we will not consider it either.

chain development and distribution. Goldman based his conclusions on a "more likely than not" standard. Goldman concluded that Griffin opened the bottle properly and the corkscrew she used was in good working condition. He opined that the cause of the malfunction was a pre-existing "Hertzian Conoid," or in other words, cone-shaped damage to brittle material (like glass) caused by "contact impact stress to the outside top corner of the finish by a hard, blunt object." Potential objects that could cause this type of damage could include "equipment in the glass plant or winery, shipping equipment, or another bottle during shelf restocking." However, Goldman could not pinpoint the exact cause of the Hertzian Conoid. He opined that "S&C Wine's practice of distributing wine in less-than-[full] case quantities and their handling methods for less-than-[full] case orders created a hazardous condition." He also opined that Albertson's method for restocking wine was "abusive." Goldman further speculated, "Antinori Filling Line Damage a Possibility." Goldman noted multiple places at the Antinori facility that *could* cause a Hertzian Conoid. First, Goldman identified a small clearance between the top of the bottles and metal in "the Maspack Casepacker which collects filled, vertical bottles from a conveyor and places them horizontally into the corrugated box." Second, Goldman determined,

> [t]here are also four times in the filling video [bottle rinser, pre-fill, filler, post-fill] that the top of the bottle is contacted, and a stainless steel tube is inserted through the finish bore. *If* misadjusted, damaged, or poorly maintained, each of these points of contact have the potential to damage the top of the finish.

(Emphasis added). However, Goldman never noted any evidence that Antinori's bottling machinery appeared to be "misadjusted, damaged, or poorly maintained."

The district court heard argument from the parties regarding summary judgment on August 19, 2019, and took the matter under advisement. On September 30, 2019, over one month *after* the district court heard argument from the parties regarding summary judgment and over two months *after* Antinori and Ste. Michelle filed their motion for summary judgment, Griffin moved the district court to compel discovery regarding Antinori and Ste. Michelle before deciding the motion for summary judgment. Griffin was not satisfied with Antinori and Ste. Michelle's responses to her requests, claiming that they did not fully disclose the information Griffin sought: photographs and chain of custody after the bottle broke, similar events of bottle breakages, communications between defendants regarding the bottle, and any demands for indemnity between the defendants. Griffin did not raise these issues in her response brief to

summary judgment or at oral argument. Griffin noticed the motion to be heard on October 15, 2019.

On October 8, 2019, the district court issued its decision on Antinori and Ste. Michelle's motion for summary judgment. The district court initially outlined that to maintain a product liability cause of action, Griffin had to meet a three part test: "1) injury; 2) that the injury was caused by a defect; and 3) that the defect existed at the time of the product left the control of the manufacturer." The district court focused on the third element and acknowledged that it was undisputed that the bottle was defective, and it caused injury.

To establish evidence on the third element, Griffin relied on her own experience opening wine bottles, along with the Goldman's expert testimony and report. The district court found Goldman's opinion to be insufficient to meet the third element:

> Mr. Goldman asserts that the Maspack Casepacker and the four insertions of a stainless steel tube in the Bottle create an opportunity to cause a Hertzian Conoid defect. For the four processes involving the insertion of a stainless steel tube into a wine bottle, Mr. Goldman predicates his opinion on the existence of improper adjustment, damage or poor maintenance of the equipment used during the process. In other words, to make the inference that these processes potentially caused the defect to the Bottle, it is necessary to prove the equipment was improperly adjusted, damaged or maintained. The Court notes that Mr. Goldman only discusses adjustment, damage or maintenance of the equipment involving the bottle rinser, pre-fill, fill and post-fill, not involving the Maspack Casepacker. Despite the 'small clearance between glass and metal' identified in the photo of the Maspack Casepacker, the Court cannot find the 'small clearance' to be a cause of Hertzian Conoid defect. Like the four processes involving the insertion of the stainless steel tube, there would have to be evidence that the Maspack Casepacker is improperly adjusted, damaged or maintained to establish sufficient evidence of the cause of the defect. Such evidence is not in the record and therefore any potential or possible inference cannot be reasonably made thereafter.

The district court, therefore, granted Antinori's and Ste. Michelle's motion for summary judgment and dismissed Griffin's suit. The district court did not address Griffin's outstanding motion to compel discovery after dismissal.

Griffin now appeals and argues the district court erred by: (1) granting Zignago's motion to dismiss by applying the "stream of commerce *plus*" test from *Asahi*; (2) denying Griffin's motion to compel the deposition of Celot; (3) granting Antinori's and Ste. Michelle's motion for summary judgment; and, (4) failing to consider Griffin's motion to compel discovery before rendering a decision on Antinori's and Ste. Michelle's motion for summary judgment.

9

## II. STANDARD OF REVIEW

In reviewing Zignago's motion to dismiss for lack of personal jurisdiction, we apply the same standard as when reviewing appeals from summary judgment orders: "we construe the evidence presented to the district court in favor of the party opposing the order and accord that party the benefit of all inferences which might be reasonably drawn." *Knutsen v. Cloud*, 142 Idaho 148, 150, 124 P.3d 1024, 1026 (2005). This Court reviews freely the determination of whether a court can exercise personal jurisdiction over an out-of-state defendant. *Id.*

Concerning Antinori's and Ste. Michelle's motion for summary judgment, "[t]his Court exercises de novo review of a grant of summary judgment and the 'standard of review is the same as the standard used by the trial court in ruling on the motion for summary judgment.' " *AED, Inc. v. KDC Invest, LLC,* 155 Idaho 159, 163, 307 P.3d 176, 180 (2013) (quoting *Stonebrook Const., LLC v. Chase Home Fin., LLC,* 152 Idaho 927, 929, 277 P.3d 374, 376 (2012)). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." I.R.C.P. 56(a). A material fact exists when a reasonable jury could return a verdict for the non-moving party based on the evidence presented. *Marek v. Hecla, Ltd.,* 161 Idaho 211, 220, 384 P.3d 975, 984 (2016). "This Court liberally construes the record in favor of the party opposing the motion for summary judgment and draws any reasonable inferences and conclusions in that party's favor." *Robinson v. Bateman-Hall, Inc.,* 139 Idaho 207, 209, 76 P.3d 951, 953, (2003).

In regards to the disputed discovering rulings, a district court enjoys broad discretion in determining whether to grant a motion to compel, and such decisions will only be reversed by this Court when there has been a clear abuse of that discretion. *Kirk v. Ford Motor Co.*, 141 Idaho 697, 700-01, 116 P.3d 27, 30-31 (2005). To determine whether the district court abused its discretion, this Court applies a four-prong test: whether the trial court "(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg v. My Fun Life,* 163 Idaho 856, 867, 421 P.3d 187, 198 (2018).

## III. ANALYSIS

**A. The district court erred in dismissing Griffin's claims against Zignago for lack of personal jurisdiction by applying the "stream of commerce *plus*" test from *Asahi*.**

**The "stream of commerce" test from *World-Wide Volkswagen* remains the standard in Idaho.**

Griffin contends the district court erred by first applying the "stream of commerce *plus*" test, and by granting Zignago's motion to dismiss for lack of personal jurisdiction. "There are two requirements for an Idaho court to properly exercise jurisdiction over non-resident defendants: (1) the non-resident's actions must fall within the scope of Idaho's long-arm statute; and (2) jurisdiction over the non-resident defendant must not violate the defendant's due process rights." *Profits Plus*, 156 Idaho at 881, 332 P.3d at 793. Identical to the proceedings below, Zignago does not contend on appeal that its actions fall outside Idaho's long-arm statute. *See* I.C. § 5-514. Rather, Zignago focuses its argument on the second prong—that the exercise of jurisdiction over it by an Idaho court would violate its due process rights. Therefore, our analysis is limited to whether Zignago's contacts with Idaho were sufficient, under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, to permit the exercise of personal jurisdiction in this case.

*1. Personal jurisdiction framework.*

In *International Shoe*, the seminal case for modern personal jurisdiction jurisprudence, the United States Supreme Court addressed the issue of "whether, within the limitations of the due process clause of the Fourteenth Amendment," a Delaware corporation had "by its activities in the State of Washington rendered itself amenable to proceedings in the courts of that state . . ." 326 U.S. at 311. The Supreme Court recognized two categories of personal jurisdiction: specific jurisdiction—based on "activities in a state"—and general jurisdiction—based on "presence in the state." 326 U.S. at 317-18. Regarding specific jurisdiction, the Court held that a State may exercise specific jurisdiction over an out-of-state defendant if the defendant "[has] certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *Id.* at 316 (citation omitted). The Court created a two-prong test for specific jurisdiction: (1) the out-of-state defendant must have sufficient minimum contacts with the forum; and (2) the exercise of jurisdiction must be fair. *Id.* The Court further elaborated on "minimum contacts," explaining that they arise "when the activities of the corporation [in the forum] have not only been continuous and systematic, but also give rise to the liabilities sued on." *Id.* at 317. Yet, the Court limited the reach of specific jurisdiction, recognizing that "the casual presence of the corporate agent or even his conduct of

11

single or isolated items of activities in a state in the corporation's behalf are not enough to subject it to suit on causes of action unconnected with the activities there." *Id.*

On the other hand, the Court in *International Shoe* recognized that general jurisdiction allows a State to exercise jurisdiction over an out-of-state defendant, even on non-related issues, because the out-of-state defendant's contacts with the forum are so substantial. *Id*. "[T]here [are] instances in which the continuous corporate operations within a state were thought so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities." *Id.* at 318. General jurisdiction has largely remained unchanged since *International Shoe*, while specific jurisdiction has been at the center of many United States Supreme Court decisions.[6] Only specific jurisdiction is at issue here.

In *Hanson v. Denckla*, the United States Supreme Court identified an essential component of the minimum contact analysis: purposeful availment. 357 U.S. 235, 251-54 (1958). In denying specific jurisdiction over an out-of-state defendant, the Court held that the minimum contacts with the forum state cannot be "unilateral" on the part of the plaintiff; rather, the defendant must reach out to the forum in some way. *Id*. at 253. "[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Id*. This is consistent with the observation made thirteen years earlier in *International Shoe*:

> [T]o the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obligations; and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue.

*International Shoe*, 326 U.S. at 319.

---

[6] This distinction between general and specific jurisdiction remains vital today. *See e.g.*, *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 927 (2011) ("Flow of a manufacturer's products into the forum, we have explained, may bolster an affiliation germane to specific jurisdiction. But ties serving to bolster the exercise of specific jurisdiction do not warrant a determination that, based on those ties, the forum has general jurisdiction over a defendant. *See, e.g., Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distributors Pty. Ltd*., 647 F.2d 200, 203, n. 5 (C.A.D.C.1981) (defendants' marketing arrangements, although "adequate to permit litigation of claims relating to [their] introduction of ... wine into the United States stream of commerce, ... would not be adequate to support general, 'all purpose' adjudicatory authority.") (some internal citations omitted).

In addition to purposeful availment, the principle of minimum contacts also requires that it be foreseeable that the defendant will be haled into court in the forum state due to its activities within the state. For example, in *Keeton v. Hustler Magazine*, the United States Supreme Court held that a magazine publisher, which had "continuously and deliberately exploit[ed] the New Hampshire market, [] must reasonably anticipate being haled into court there in a libel action based on the contents of its magazine." 465 U.S. 770, 781 (1984). The Court focused on the foreseeability of the potential harm and explained that such an outcome was proper because "[t]here is no unfairness in calling it to answer for the contents of that publication wherever a substantial number of copies are regularly sold and distributed." *Id*.

The second prong of the due process analysis, as articulated by the Court in *International Shoe*, considers the fairness of a court exercising jurisdiction over the out-of-state defendant. *See International Shoe*, 326 U.S. at 316 ("maintenance of the suit [should] not offend 'traditional notions of fair play and substantial justice.' ") (citation omitted). The Court has identified the reasonableness, or "fairness" factors as: (1) the burden on the defendant; (2) the interests of the forum State; (3) plaintiff's interests in obtaining relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and, (5) the shared interest of the several States in furthering fundamental substantive social policies. *See Daimler AG v. Bauman*, 571 U.S. 117, 139 n. 20 (2014).

Therefore, under the Due Process Clause, the United States Supreme Court's framework for courts analyzing a personal jurisdiction issue can be summarized as follows: a State may exercise specific jurisdiction over an out-of-state defendant if the defendant "[has] certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *International Shoe*, 326 U.S. at 316 (citation omitted). When determining the sufficiency of the alleged "minimum contacts," courts should first look to whether the defendant "purposefully availed" itself to the forum state. For example, whether "there [is] some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson*, 357 U.S. at 253. Second, courts should determine whether it is foreseeable that the defendant would be haled into that forum state's court. *Keeton*, 465 U.S. at 781. The final determination a court should undertake is whether exercise of jurisdiction over the out-of-state defendant is fair. This consideration is guided by (1) the burden on the defendant; (2)

the interests of the forum State; (3) plaintiff's interests in obtaining relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and, (5) the shared interest of the several States in furthering fundamental substantive social policies. *Daimler*, 571 U.S. at 139 n. 20.

   2.   *The birth of the "stream of commerce" doctrine.*

In 1980, the United States Supreme Court tackled a difficult question regarding minimum contacts and purposeful availment in *World-Wide Volkswagen*: the situation in which a company manufactures its product in State or Country A, sells the product to a party in State B by placing the product into "the stream of commerce," and then the product ends up in State C and causes an injury there. *World-Wide Volkswagen* is the first of a trio of cases addressing this unique situation, which lies at the heart of this case.

In *World-Wide Volkswagen*, the Robinson family purchased an Audi vehicle from a dealership in New York and the following year moved to Arizona. 444 U.S. at 288. During the drive from New York to Arizona, the family's car was rear-ended in Oklahoma causing a fire which resulted in severe injuries. *Id.* The Robinsons brought a product liability suit in Oklahoma, joining the manufacturer, its importer, the regional distributor, and the retailer, claiming a defective design and placement of the Audi's gas tank. *Id.* Importantly, the appeal only concerned the regional distributor and the retailer, which specially appeared in the underlying action to contest personal jurisdiction. *Id.* The regional distributor was incorporated in New York and had its business office in New York, but it also distributed cars, parts, and accessories to retailers in New York, New Jersey, and Connecticut. *Id.* at 288-89. The retailer was incorporated in New York and had its principal place of business there. *Id.* at 289.

On appeal, the United States Supreme Court held that a "forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." *World-Wide Volkswagen*, 444 U.S. at 297-98. This became known as the "stream of commerce" test. *Id.* The Court reasoned:

> When a corporation purposefully avails itself of the privilege of conducting activities with the forum State, it has clear notice that it is subject to suit there, and can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State. Hence if the sale of a product of a manufacturer or distributor . . . is not simply an isolated occurrence, *but arises from the efforts of*

14

*the manufacturer or distributor to serve, directly or indirectly, the market for its product* in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owners or others.

*Id.* at 297 (emphasis added, internal quotations and citations omitted). The Court explained that the "stream of commerce" refers to the formal or informal distribution networks that a manufacturer uses to "serve directly or indirectly, the market for its product in other States." *Id.* at 297.

In the Robinsons' case, neither the distributor nor the retailer carried on any activity in Oklahoma. *Id.* at 295. They did not close any sales, perform any services, or solicit any business in Oklahoma. *Id.* While the Robinsons argued that vehicles are mobile by their very design and purpose and, therefore, it was foreseeable that the vehicle could end up in Oklahoma, the Court dismissed this argument, reasoning:

[T]he foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State. Rather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.

*Id.* at 297. In the Robinsons' case, the vehicle happened to find its way into the forum state solely by the actions of the plaintiffs, rather than by the distributor and the retailer actively reaching out and "avail[ing] themselves of [any] of the privileges and benefits of Oklahoma law." *Id.* at 295. Therefore, the Court reversed the exercise of jurisdiction by the Oklahoma courts over the distributor and the retailer. *World-Wide Volkswagen* became a landmark decision, however, because the majority set forth what we now call the "stream of commerce" theory of jurisdiction, which provides a basis for courts to assert personal jurisdiction over out-of-state manufacturers consistent with the Due Process Clause. *Id.* at 297.

  3.  *Challenges to the "stream of commerce" doctrine.*

Just seven years later, the United States Supreme Court revisited the "stream of commerce" theory in *Asahi*. Gary Zurcher brought suit after he lost control of his motorcycle and collided with a tractor, causing him substantial injuries and killing his wife, who was his passenger. 480 U.S. at 105. Zurcher filed suit in California alleging a defective rear tire, tube, and sealant. *Id.* at 106. He sued the Taiwanese manufacturer of the tube, which in turn filed a cross-complaint seeking indemnification from Asahi, the tube's valve assembly manufacturer.

*Id.* Zurcher's claims with the Taiwanese manufacturer were settled, leaving the manufacturer's indemnity action against Asahi. *Id.*

Asahi was a Japanese corporation that manufactured tire valve assemblies in Japan. *Id.* Asahi sold the assemblies to several manufacturers to use in finished tire tubes. *Id.* Asahi's sales to the Taiwanese manufacturer in this case took place in Taiwan. *Id.* Over a five-year period, the Taiwanese manufacturer bought and incorporated 1.25 million valve assemblies from Asahi. *Id.* Approximately twenty percent of the Taiwanese manufacturer's sales occurred in California. *Id.* Asahi contested personal jurisdiction in California. *Id.* at 106-07. The parties filed competing statements – Asahi stated that it never contemplated its sales of valve assemblies in Taiwan would subject it to suit in California; while the Taiwanese manufacturer stated that it informed Asahi, and believed Asahi to be fully aware, that the valve assemblies would be sold throughout the United States, including California. The Supreme Court of California affirmed the district court's exercise of jurisdiction over Asahi.

On appeal to the United States Supreme Court, none of the three opinions in *Asahi* garnered a majority vote. Justice O'Connor penned the plurality opinion for the Court and noted that since *World-Wide Volkswagen*, courts have taken two different approaches in its application. *Id.* at 110. First, some courts had applied the straight "stream of commerce" test from *World-Wide Volkswagen*, allowing an exercise of personal jurisdiction on no more than a defendant's action of placing the product in the stream of commerce, coupled with an awareness that the product would be sold in the forum State. *Id.* at 110-11. Other courts demanded more, requiring "the action of the defendant to be more purposefully directed at the forum State than the mere act of placing a product in the stream of commerce." *Id.* at 110. The plurality endorsed the requirement for "more"; thus, what is now known as the "stream of commerce *plus*" test was born.[7] *Id.* at 112. Justice O'Connor explained the rationale for adding an additional requirement to the existing "stream of commerce" test:

> The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing for

---

[7] It should be noted that the phrase, "stream of commerce plus" test, does not appear in *Asahi*. Its first use in a reported decision in this context may date back to 1990. *See Abuan v. Gen. Elec. Co.,* 735 F. Supp. 1479, 1484 (D. Guam 1990) ("[T]his Court will refer to [the test] as the 'stream-of-commerce plus' test.").

regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State. But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.

*Id.* at 112. The plurality went further, reasoning that even if Asahi were aware that some of its valve assemblies would be sold in California – that would not be enough to establish Asahi's purposeful availment to the California market. *Id.* This was because Asahi had no office, agents, employees, or property in California and it did not advertise or solicit business there, and it did not create or control the distribution system. *Id.* The plurality went on to analyze the "fairness" factors and concluded that the exercise of personal jurisdiction over Asahi would also offend the "traditional notions of fair play and substantial justice." *Id.* at 113-16.

Justice Brennan penned a concurrence in which he agreed that a consideration of the fairness factors led to the conclusion that the exercise of personal jurisdiction would violate the Due Process Clause. *Id.* at 116 (Brennan, J., concurring in part and concurring in judgment). Therefore, he concurred in the judgment of the Court. *Id.* However, he explicitly disavowed the plurality's adoption of the "stream of commerce *plus*" test. *Id.* at 116-21. He noted that the "stream of commerce *plus*" test was a minority view among the Federal Courts of Appeals at the time and represented a marked retreat from *World-Wide Volkswagen*. *Id.* at 118. Justice Brennan saw no need for a requirement to show "additional conduct" directed toward the forum state. *Id.*

> The stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale. As long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise. . . . A defendant who has placed goods in the stream of commerce benefits economically from the retail sale of the final product in the forum State, and indirectly benefits from the State's laws that regulate and facilitate commercial activity. These benefits accrue regardless of whether that participant directly conducts business in the forum State, or engages in additional conduct directed toward that State.

*Id.* at 117.

Almost twenty-five years after *Asahi*, the Court was again presented with a "stream of commerce" case in *J. McIntyre*. There, Robert Nicastro seriously injured his hand while using a metal-shearing machine manufactured by J. McIntyre Machinery, Ltd. 564 U.S. at 878. J. McIntyre was incorporated and operated in England, which is also where the machine was made.

*Id.* However, the accident occurred in New Jersey. *Id.* The New Jersey Supreme Court determined that the New Jersey courts could exercise personal jurisdiction over J. McIntyre because: (1) an independent company agreed to sell J. McIntyre's machines in the United States; (2) J. McIntyre officials attended many conventions in various states, but never New Jersey; (3) four machines identical to the one that caused Nicastro's injury ended up in New Jersey; (4) J. McIntyre held patents on its recycling technology in Europe and the United States; and, (5) the U.S. distributor "structured [its] advertising and sales efforts in accordance with J. McIntyre's direction and guidance whenever possible, and that at least some of the machines were sold on consignment to the distributor." *Id.* at 878-79 (internal quotes and citations omitted). On appeal to the United States Supreme Court, a plurality of the Court reversed the judgment of the New Jersey Supreme Court; however, once again, no opinion obtained a majority vote. *Id.* at 879.

Justice Kennedy authored the plurality opinion, which endorsed the "stream of commerce *plus*" test articulated by Justice O'Connor in *Asahi*. *Id.* at 881-86.[8] He described the principal inquiry as, "whether the defendant's activities manifest an intention to submit to the power of a sovereign. In other words, a defendant must 'purposefully avail itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' " *Id.* at 882. The plurality again supported the "stream of commerce *plus*" test, writing, "[t]he defendant's transmission of goods permits the exercise of jurisdiction only where the defendant can be said to have targeted the forum; as a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum State." *Id.* The plurality applied the "stream of commerce *plus*" test to the facts at hand and concluded that J. McIntyre never purposefully availed itself of the New Jersey market. *Id.* at 886. The plaintiff had failed to show any evidence that J. McIntyre purposefully directed any conduct toward New Jersey, even though it directed marketing and sales efforts at the United States generally. *Id.* Justice Kennedy's plurality opinion was joined by Chief Justice Roberts, Justice Scalia, and Justice Thomas.

Justice Breyer, joined by Justice Alito, concurred in the judgment, but not the reasoning of the plurality. *Id.* at 887-93 (Breyer, J. concurring in the judgment). Justice Breyer opined that

---

[8] Of note, Justice Kennedy never used the phrase "stream of commerce *plus*" in *J. McIntyre*. His plurality opinion, which expressly rejected the broad "stream of commerce" approach from *World-Wide Volkswagen*, required additional conduct purposefully directed at the forum. This is precisely what the "stream of commerce *plus*" test requires.

the same outcome could be reached merely by relying on precedent, such as *World-Wide Volkswagen*. He noted that the plurality did not need to "mak[e] broad pronouncements that refashion basic jurisdictional rules." *Id.* at 890. Adhering to precedent, Justice Breyer noted that a single isolated sale was insufficient for asserting jurisdiction, and that precedent would resolve the case here. *Id.* Notably, Justice Breyer questioned the plurality's strict jurisdictional rule requiring a defendant "to submit to the power of a sovereign" and to "have targeted the forum." *Id.* He reasoned:

> But what do those standards mean when a company targets the world by selling products from its Web site? And does it matter if, instead of shipping the products directly, a company consigns the products through an intermediary (say, Amazon.com) who then receives and fulfills the orders? And what if the company markets its products through popup advertisements that it knows will be viewed in a forum? Those issues have serious commercial consequences but are totally absent in this case.

*Id.* at 890. Interestingly, some of the very same issues raised by Justice Breyer, which were absent in *J. McIntyre*, are present in the case at bar.

    4.  <u>The "stream of commerce" test remains the controlling precedent in Idaho.</u>

Since the confusing plurality opinions in *Asahi* and *J. McIntyre*, this Court has yet to analyze their precedential effect in Idaho.[9] When examining plurality opinions, Idaho courts adhere to the "narrowest grounds" analysis. Again, that analysis provides, " '[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.' " *Wass*, 162 Idaho at 366, 396 P.3d at 1248 (quoting *Marks*, 430 U.S. at 193).

As astutely noted below by the district court, the Colorado Supreme Court recently conducted an identical analysis in *Align*, 421 P.3d 163. There, a plaintiff brought suit in

---

[9] This Court recently addressed personal jurisdiction issues in *Profits Plus*, 156 Idaho 873, 332 P.3d 785 (2014), and *H20 Envtl. Inc. v. Proimtu MMI, LLC*, 162 Idaho 368, 397 P.3d 398 (2017). However, neither case discussed the "stream of commerce" test, as both cases involved contracts. *See Profits Plus*, 156 Idaho at 884 (contract provided for ownership of Idaho company); *H20 Envtl.*, 162 Idaho at 371 (contract provided that some essential services were to be performed in Idaho). On the other hand, this Court in *Doggett v. Electronics Corp. of America*, 93 Idaho 26, 454 P.2d 63 (1969) and *Duignan v. A.H. Robins Co.*, 98 Idaho 134, 559 P.2d 750 (1977) adopted a stream of commerce type rationale before *World-Wide Volkswagen* was decided. *See Doggett*, 93 Idaho at 31-32 ("In placing their goods in the flow of interstate commerce, the respondents must have had the reasonable expectation that such items would be shipped indiscriminately throughout the United States. If dangerously defective goods are placed in the interstate flow of commerce, those whose negligence created the defect should be prepared to defend themselves wherever injury should occur."); *Duignan*, 98 Idaho at 138 (same).

Colorado against a foreign manufacturer when the manufacturer's "rotor holder" failed and caused the plaintiff's radio-controlled helicopter blade to strike the plaintiff in the eye. *Id.* After analyzing *World-Wide Volkswagen* and the plurality opinions in *Asahi* and *J. McIntyre*, the Colorado Supreme Court found *World-Wide Volkswagen* to be the controlling precedent and held that Colorado courts had specific personal jurisdiction over the foreign manufacturer. *Id.* We reach the same conclusion as the Colorado Supreme Court in *Align*: that *World-Wide Volkswagen* is still controlling precedent.

In *Asahi*, Justice O'Connor's opinion attempted to transform the United States Supreme Court's jurisdictional jurisprudence from the *World-Wide Volkswagen* "stream of commerce" test into a more stringent "stream of commerce *plus*" test by adding the requirement that the defendant must have additional directed conduct with the forum state. *Asahi*, 480 U.S. at 112. However, this was a plurality opinion. Justice Brennan's concurrence—joined by three other Justices—only concurred with the plurality on the "fairness" factors and in the judgment of the Court; otherwise, Justice Brennan relied on the framework of *World-Wide Volkswagen*. *Id.* at 120-21. This left Justice Brennan's view with the narrowest grounds, and thus *World-Wide Volkswagen* was not overturned but remained unaltered.

Similarly, in *J. McIntyre*, Justice Kennedy issued an opinion that attempted to alter *World-Wide Volkswagen* and add the requirement that the defendant must purposefully target the forum state—essentially a nuanced variation on the "stream of commerce *plus*" test. *Id.* at 879. However, again, this was a plurality opinion. It was Justice Breyer's concurrence in the overall judgment that decided the case. *Id.* at 890. Justice Breyer, joined by Justice Alito, rejected the plurality's new approach and instead opined that the case could be decided by relying on the Court's precedential opinion in *World-Wide Volkswagen*. *Id.* at 890. His concurrence, similar to Justice Brennan's in *Asahi*, is once again the narrowest grounds. Therefore, the "stream of commerce *plus*" test has never had the assent of the majority of the United States Supreme Court. Accordingly, *World-Wide Volkswagen* remains the precedential and controlling opinion when it comes to stream of commerce cases.

Turning to the case at hand, the district court recognized that Idaho employs the narrowest grounds analysis and came to the same conclusion as the Court in *Align*. Yet, the district court did not adhere to the narrowest grounds analysis or *World-Wide Volkswagen's* precedent. Instead, the district court stated that it "believes the 'stream of commerce *plus*' test is

20

the appropriate test to apply in a specific jurisdiction case." In its decision, the district court noted that, "the requirements of additional acts in *Schneider* and *Profits Plus* tip the scale in favor of the 'stream of commerce *plus*' test." As noted above, *Profits Plus* was a contract case, and did not deal with the "stream of commerce" jurisdictional theory.

In *Schneider*, a widowed spouse brought suit against two Pennsylvania corporations, Cambria Corp. and Keystone Corp., after her husband's death in a helicopter accident. 104 Idaho at 211, 657 P.3d at 1079. The malfunctioning helicopter was originally owned by Keystone, which then sold it to Cambria. *Id.* Cambria owned the helicopter for five years and employed Keystone to maintain it. *Id.* Then, Cambria sold the helicopter to another Pennsylvania corporation and that corporation then sold it to decedent's employer. *Id.* The Idaho Supreme Court declined to exercise jurisdiction over Cambria and Keystone. *Id.* at 212-215, 657 P.3d at 1080-1083. Although the plaintiff argued the "stream of commerce" theory, neither corporation had any contacts with Idaho: they did not conduct activities here, they did not conduct any business here, and they did not have any offices here. *Id.* At one point Cambria merely owned the helicopter and sold it to another Pennsylvania corporation. *Id.* Keystone also owned the helicopter at one point and was employed to maintain it. *Id.* Keystone was not a manufacturer and did not place the helicopter into the stream of commerce as a manufacturer would do when it sells its product. As the *Schneider* court concluded:

> Under the rule of *World-Wide Volkswagen*, we cannot predicate jurisdiction on the fortuitous circumstance that a helicopter serviced in Pennsylvania by a Pennsylvania corporation for a Pennsylvania corporation happened to be purchased by an Idaho corporation and was involved in an accident which resulted in the death of an Idaho resident.

*Id.* at 213–14, 657 P.2d at 1081–82. Keystone's only connection with Idaho, as the forum state, was based on a single "fortuitous circumstance" that brought the helicopter to Idaho. There was no "purposeful availment" of Idaho's markets and consumers, just a single product brought into Idaho by a customer through no effort or awareness of Keystone. Thus, we do not read *Schneider* as the district court did to require additional conduct directed towards Idaho. Rather, *Schneider* deals with a scenario where application of a straight "stream of commerce" analysis, without adding the *Asahi* "plus," was sufficient to deny jurisdiction because the case concerned an isolated incident.

In the case at bar, the district court applied the "stream of commerce *plus*" test, opining that there is a "federal evolution towards [sic] a stricter personal jurisdiction standard . . . ."

21

However, in a case such as this, the proper determination for a trial court is not to predict where it believes the law is headed in the future, but to follow the law as it exists today.[10] Based on the forgoing analysis, we conclude that we are bound by *World-Wide Volkswagen*, the reasoning in Justice Brennan's concurring opinion in *Asahi*, and Justice Breyer's concurring opinion in *J. McIntyre*. Accordingly, the district court erred by applying the stricter "stream of commerce *plus*" test to Zignago's motion to dismiss.

> 5. *Applying the "stream of commerce" test, exercising personal jurisdiction would not violate Zignago's constitutional right to due process.*

To satisfy *World-Wide Volkswagen's* test, Griffin must show that Zignago "deliver[ed] its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." 444 U.S. at 297-98. An isolated occurrence, or a single sale of a product will not be sufficient. *Id.* at 297; *J. McIntyre*, 564 U.S. at 890 (Breyer, J. concurring). This theory was affirmed in Justice Brennan's concurring opinion in *Asahi*:

> The stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale. As long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise.

*Asahi*, 480 U.S. at 117 (Brennan, J. concurring).

---

[10] While the district court's view of where the United States Supreme Court's personal jurisdiction jurisprudence is heading may ultimately prove correct, it is by no means a certainty. A closer analysis suggests that the perceived inertia towards the "stream of commerce *plus*" test may have stalled, or even reversed course. The test was first suggested by Justice O'Connor in 1987 in *Asahi*. It is reasonable to conclude that many scholars believed that was where the law was heading after *Asahi*. However, almost twenty-five years later in *J. McIntyre*, there was still no majority support for the "stream of commerce *plus*" test. Also of note, the plurality who favored the "stream of commerce *plus*" test in *J. McIntyre* lost two of its votes (J. Kennedy and J. Scalia) while the concurrence that followed *World-Wide Volkswagen* is still intact (J. Breyer and J. Alito). Moreover, the dissent in *J. McIntyre* lost one vote (J. Ginsburg). If the *J. McIntyre* case were heard today, there would presumably be two votes for the plurality, two for the concurrence, and two for the dissent (not considering the three new justices – Justice Gorsuch, Justice Kavanaugh, and Justice Barrett – who did not participate in the original *J. McIntyre* decision.) Only Justice Barrett has issued a reported opinion (during her tenure on the Second Circuit Court of Appeals) that addressed the "stream of commerce" issue. *See J.S.T. Corp. v. Foxconn Interconnect Tech. Ltd.*, 965 F.3d 571 (2020). There, Justice Barrett applied the "stream of commerce" test from *World-Wide Volkswagen*, noting that it has yet to be overruled by the United States Supreme Court.

Furthermore, the United States Supreme Court cited *World-Wide Volkswagen* multiple times in its recent decision in *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017 (2021). The Court, with eight justices concurring in the judgment (Justice Barrett did not participate), held that Montana had specific jurisdiction to hear a product liability claim. The Court noted: "[T]his Court has stated that specific jurisdiction attaches in cases identical to this one—when a company cultivates a market for a product in the forum State and the product malfunctions there." *Id.* at 1019 (citing *World-Wide Volkswagen*, 444 U. S. at 100). In short, rumors of *World-Wide Volkswagen's* imminent demise may be greatly exaggerated.

Here, Zignago's forum contacts most resemble those in *Asahi*. The plurality in *Asahi* applied the stricter "stream of commerce *plus*" test; however, Zignago's contacts with Idaho were not isolated, minimal, or fortuitous; but part of the formal and informal distribution networks that Zignago used to "serve directly or indirectly, the market for its product in other States." *World-Wide Volkswagen*, 444 U.S. at 297. It is true Zignago did not design its bottles specifically for the Idaho market, advertise in Idaho, establish channels for providing regular advice to Idaho consumers, employ distributors as sales agents in Idaho, operate an office in Idaho, own or lease property in Idaho, or send employees to Idaho for any reason. However, these are examples of additional conduct—or the "plus"—the Court in *Asahi* required to meet the stricter version of the stream of commerce test. What the record shows that Zignago did do was place millions of its bottles in the United States by selling them to a manufacturer it reasonably knew exported those bottles throughout the United States through a network of exporters, distributors, and retailers.

Although the district court applied the wrong test, the district court's findings actually satisfy the "stream of commerce" standard. The district court noted that it would have found specific personal jurisdiction had it applied the "stream of commerce" test:

> Without a doubt, Zignago is a large foreign manufacturer of bottles. Antinori purchased 92,209,000 wine bottles from Zignago between 2008 and June 30, 2018. In that same time period, Antinori exported 43,800,000 bottles of wine to the United States. These facts support the Court's conclusion that Zignago placed the Bottle within the stream of commerce in Italy with the expectation that its manufactured wine bottles, including the Bottle, would be sold throughout the United States. In fact, thousands of Zignago's bottles have reached Idaho. But the expectation that the Bottle would enter the stream of commerce is not enough to establish personal jurisdiction under the "stream of commerce *plus*" test.

There can be no doubt that Zignago placed its product into the stream of commerce. During a ten-year period, Zignago sold over 92 million bottles to Antinori alone, and Antinori exported over 46 percent of those – 43 million bottles – to the United States. This does not include any other U.S. importers, distributors, or retailers beyond those involved in this case. Moreover, Ste. Michelle has exported 1,308 bottles of Villa Antinori Classico Riserva to Idaho since 2013. In the same period, S&C, only one Idaho distributor, sold 138 bottles. Albertson's sold almost 300 bottles. Given the extensive network into which Zignago sent its bottles, it cannot credibly maintain it was unforeseeable that its bottles would end up in the hands of a chef in Idaho. Zignago's wide and massive distribution network takes it out of the realm of isolated or single

contacts and satisfies the *World-Wide Volkswagen's* definition of placing a product into the stream of commerce.

Beyond merely placing its bottles into the stream of commerce, Zignago knew its bottles were being sold and distributed in the United States. Even though Celot declared in his affidavit that he did not know any bottles would end up in the United States, the district court found otherwise: "[t]hese facts support the Court's conclusion that Zignago placed the Bottle within the stream of commerce in Italy *with the expectation* that its manufactured wine bottles, including the Bottle, would be sold throughout the United States." (Emphasis added). We agree. Zignago's sheer volume of sales gave it at least implicit knowledge of its contacts with the United States. Additionally, the district court found that before entering into their agreement, Zignago discussed with Antinori "the details of the relationship, including the product to be purchased and the markets Antinori operates in." Zignago cannot now place its head in the sand and claim it did not know where its bottles were going.

Because of Zignago's mass production and Antinori's exportation of over 43 million bottles to the United States, Zignago cannot reasonably assert that is was "surprised" to be haled into any state court in the United States. Again, the sheer volume of its operation likely constitutes purposeful availment to each and every state. It maintains two subsidiaries that operate in the United States, and its subsidiaries define Zignago as "a manufacturer and distributor in North America." Zignago clearly enjoyed the monetary benefits of selling and distributing its bottles to the United States. This is what Justice Brennan referred to as the "regular and anticipated flow of products from manufacture to distribution to retail to sale" not "unpredictable currents or eddies." *Asahi*, 480 U.S. at 117 (Brennan, J., concurring). Indeed, while Idaho may be a relatively small market, it should not be surprising to Zignago that many of the bottles it placed into the stream of commerce were carried by market currents until they wended their way into Idaho.

Turning to our consideration of the "fairness" factors, this is where this case significantly departs from the facts of *Asahi* and we find that the assertion of personal jurisdiction over Zignago would not violate "traditional notions of fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 316 (internal quotation omitted). In *Asahi*, Zurcher's claims against the Taiwanese manufacturer and Asahi were dismissed, which only left the indemnity claim between Asahi and the manufacturer. 480 U.S. at 106. Therefore, the interest of California in this dispute was

minimal. *Id.* at 114. Asahi would be forced to defend itself in California to resolve its dispute with the Taiwanese manufacturer when the claim could be more easily resolved in Taiwan or Japan. In addition, although the accident occurred in California, Zurcher was not a California resident and was no longer involved in the case; thus, California no longer held an interest in adjudicating the matter. Furthermore, the Court questioned applying California law to an indemnity action between two foreign entities. It thus concluded: "[c]onsidering the international context, the heavy burden on the alien defendant, and the slight interests of the plaintiff and the forum State, the exercise of jurisdiction by a California court over Asahi in this instance would be unreasonable and unfair." *Id.* at 116.

Here, the parties, apparently assuming the remaining fairness factors are not relevant, only discuss the first three factors: (1) the burden on the defendant; (2) the interests of the forum State; and, (3) plaintiff's interests in obtaining relief. First, the burden on Zignago would be great. It would be forced to travel to Idaho, an entirely different country and foreign jurisdiction to defend one of the ninety-two million bottles it produced. However, a forum is constitutionally acceptable unless it is so "gravely difficult and inconvenient that a party is unfairly put at a severe disadvantage in comparison to his opponent." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985). While this burden on Zignago is real, it is no greater than any other foreign manufacturer. It is also a reasonable burden imposed on a defendant who has availed itself of the privileges and benefits of conducting business in Idaho. Zignago suffers no additional burden by defending in Idaho as it would in any other State.

Second, Idaho has a clear and strong interest in providing its residents with a forum to adjudicate product liability claims. Idaho's interest in protecting its citizens is neither unique nor provincial. As the U.S. Supreme Court recognized in *Burger King,* "[a] state generally has a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out of state actors." *Id.* at 473. *Burger King* further explains that this interest is especially acute in cases where the out-of-state actor intends to be profited by its contact with the forum state:

> Moreover, where individuals "purposefully derive benefit" from their interstate activities, it may well be unfair to allow them to escape having to account in other States for consequences that arise proximately from such activities; the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed.

*Id.* at 473-74 (internal citations omitted).

Third, Griffin has a strong interest in obtaining relief in her home state. She lives in Idaho, she purchased the defective bottle in Idaho, the incident occurred in Idaho, and the bulk of her evidence is in Idaho. Importantly, Griffin did not travel to Italy to purchase the bottle and bring it back to Idaho; rather, the bottle was shipped, sold, and caused damage in Idaho. Therefore, it would place an unreasonable burden to force Griffin to venture to Italy to seek redress. All of the "fairness" factors weigh in favor of an Idaho court reasonably and fairly exercising jurisdiction over Zignago.

In sum, the district court erred when it adopted the "stream of commerce *plus*" test to determine personal jurisdiction. We clarify that the proper method today in Idaho is still the "stream of commerce" test from *World-Wide Volkswagen*. Applying that test to the facts of this case, Zignago placed its product into the stream of commerce with the expectation it would be sold in the United States, including Idaho. Zignago purposefully availed itself of the monetary benefits of conducting activity in Idaho and it was not unforeseeable or a surprise for Zignago to be haled into court in Idaho. This decision does not offend the traditional notions of fair play and substantial justice because the burden on Zignago to defend here is relatively minimal compared to Idaho's strong interest in protecting its citizens from defective products and Griffin's strong interest in seeking redress here. Therefore, this Court reverses the district court's adoption of the "stream of commerce *plus*" test and, accordingly, also reverses the decision to grant Zignago's motion to dismiss Griffin's case against Zignago for lack of personal jurisdiction.

**B. Because the case will be remanded, we need not decide whether the district court erred by denying Griffin's motion to compel the deposition of Roberto Celot.**

Griffin contends that the district court's denial of her motion to compel Celot's deposition in Idaho was an abuse of discretion because the district court failed to consider the correct legal standard in making its decision. At the time the deposition was requested, it solely concerned the issue of jurisdiction. Because we have reversed the district court's decision and concluded that Idaho has personal jurisdiction to hear Griffin's claims against Zignago, we need not decide whether it was error for the trial court to deny Griffin's motion to compel Celot's deposition in Idaho.

**C. The district court did not err in granting Antinori and Ste. Michelle's motion for summary judgment because Griffin failed to show she could establish a prima facie product liability case.**

Griffin contends the district court erred when it granted summary judgment because the district court only relied on the "specific-defect" test, instead of also applying the "malfunction" test. Furthermore, Griffin claims the district court required Griffin to show that Antinori caused the defect in the bottle; instead, she asserts that she must only show that the defect existed when it left the control of the manufacturer, or a lack of reasonable secondary causes.

Griffin's assertion that the district court only applied the "specific-defect" test instead of also applying the "malfunction" test warrants explanation. In *Farmer*, 97 Idaho 742, 553 P.2d 1306, this Court explained the methods by which a plaintiff can show a product is defective. What Griffin calls the "specific-defect" test, was the traditional way of showing a *prima facie* case of strict product liability prior to *Farmer*. 97 Idaho at 746, 553 P.2d at 1310. It required a plaintiff to allege and prove: "1) he was injured by the product; 2) the injury was the result of a defective or unsafe product; and 3) the defect existed when the product left the control of the manufacturer." *Id.* at 746-47, 553 P.3d at 1310-11. However, this Court noted that, "[w]hile direct evidence of [an] identifiable defect is the strongest evidence of a product's defective condition, . . . such evidence of a defect in a product which was present when it left the manufacturer's control will be rare and unusual." *Id.* at 747, 553 P.2d at 1311. Therefore, this Court adopted an additional way by which a plaintiff can show a product is defective – what Griffin calls the "malfunction" test. *See id.*

In *Farmer*, this Court described the "malfunction" test as follows: "[a] prima facie case may be proved by direct or circumstantial evidence of [1] a malfunction of the product and [2] the absence of evidence of abnormal use and [3] the absence of evidence of reasonable secondary causes which would eliminate liability of the defendant." *Id.* The Court drew no distinction between a defect and a malfunction, reasoning that a malfunction is circumstantial evidence of a defect because a product will not ordinarily malfunction. *Id.* at 748, 553 P.2d at 1312. The second element is related to malfunction in that a plaintiff must show that the malfunction was not caused by abnormal use. *Id.* Finally, regarding the elimination of reasonable secondary causes, this Court stated, "[o]f additional relevance are the age of a product and the length of its use, the severity of its use, the state of its repair, its expected useful life *and the fact that the source of the malfunction is an enclosed system relatively immune from tampering or alteration once the product leaves the manufacturer's control*." *Id.* (Emphasis added). "A

27

plaintiff need not exclude every possible cause but only reasonably likely causes." *Id.* at 749, 553 P.2d at 1313.

Thus, *Farmer* clarifies that when there is evidence of a malfunction of the product, the absence of evidence of abnormal use is circumstantial evidence sufficient to establish a prima facie case of a defect in the product. Additionally, "the absence of evidence of reasonable secondary causes which would eliminate liability of the defendant" constitutes circumstantial evidence that, in the absence of direct evidence, the defect in the product existed when it left the manufacturer. *Id.* The weight to be afforded such evidence is typically a question for the trier of fact. *Id.* at 748-49, 553 P.2d at 1312-13.

We revisited the issue in *Massey v. Conagra Foods, Inc.*, 156 Idaho 476, 328 P.3d 456 (2014). This Court was tasked with determining whether a poultry pot pie contaminated with salmonella was a "defect" sufficient to avoid summary judgment dismissal against the plaintiff. *Id.* at 480-81, 328 P.3d at 460-61. The disputed evidence showed that samples of the strain of salmonella from the plaintiff matched strains found in Conagra's Delaware production facility. *Id.* at 479, 328 P.3d at 459. In its analysis, this Court stated that the "malfunction" test is an alternative method to show a "defect" through circumstantial evidence. *Id.* at 480, 328 P.3d at 460. However, the central issue in *Massey* centered on whether there was a defect in the pot pie. The Court held that the plaintiff's testimony alone created enough of an inference to establish that fact for summary judgment purposes. *Id.* at 481, 328 P.3d at 461. In the case at bar, the dispute is not whether there was a defect in the bottle. Rather, this appeal concerns whether there was evidence of a defect before it left Antinori's control or, whether "an absence of evidence of reasonable secondary causes" which would eliminate Antinori and Ste. Michelle's from liability. *Farmer*, 97 Idaho at 747, 553 P.2d at 1311.

Turning to the case at hand, this Court finds under either the "specific-defect" test or the "malfunction" test, the district court properly granted summary judgment to Antinori and Ste. Michelle. Griffin's contention is accurate: the district court did not *explicitly* analyze her claim under the "malfunction" test. At summary judgment, as noted, Antinori and Ste. Michelle only challenged the third element of either test – that "the defect existed when it left the control of the manufacturer" or "the absence of evidence of reasonable secondary causes which would eliminate liability of the defendant." *See Farmer*, at 746-47, 553 P.3d at 1310-11. The district court clearly analyzed Griffin's claim under the third prong of both tests. Contrary to Griffin's

assertions, while the court may not have explicitly referenced the "malfunction test" it clearly applied it because it referred to the circumstantial evidence in the record and acknowledged in its memorandum decision, quoting directly from *Farmer*, that direct evidence would be "rare and unusual." *Id*. at 747, 553 P.2d at 1311. The court even cited from the Idaho Civil Jury Instructions and noted that "[e]vidence may be either direct or circumstantial." IDJI 1.24.2. The totality of its analysis demonstrates the court recognized that Griffin could establish that the defect existed when it left the control of the manufacturer through circumstantial evidence by showing the absence of evidence of reasonable secondary causes for the defect.

Griffin failed to show direct or circumstantial evidence of a defect in the bottle at the time it left Antinori. Although Goldman noted multiple production processes in Antinori's facility that *could have* resulted in a Hertzian Conoid, he offered no definitive statement. Instead, Goldman qualified each of his conclusions regarding Antinori's culpability. For example, Goldman stated, "[*i*]*f* misadjusted, damaged, or poorly maintained, each of these points of contact *have the potential* to damage the top of the finish." (Emphasis added). The district court noted this speculation as well:

> For the four processes involving the insertion of a stainless steel tube into a wine bottle, Mr. Goldman predicates his opinion on the existence of improper adjustment, damage or poor maintenance of the equipment used during the process. In other words, to make the inference that these processes potentially caused the defect to the Bottle, it is necessary to prove the equipment was improperly adjusted, damaged or maintained. . . . Like the four processes involving the insertion of the stainless steel tube, there would have to be evidence that the Maspack Casepacker is improperly adjusted, damaged or maintained to establish sufficient evidence of the cause of the defect. Such evidence is not in the record and therefore any potential or possible inference cannot be reasonably made thereafter.

In other words, Goldman opined that the machine used by Antinori that inserted a stainless steel hose down into the bottle would only *potentially* cause a Hertzian Conoid *if* the machine were misadjusted, damaged, or poorly maintained. Griffin offered no evidence to satisfy Goldman's qualifier that the machine *was* misadjusted, damaged, or poorly maintained.

Under the "specific-defect' test, taking all evidence and inferences in the light most favorable to Griffin, this Court cannot make a reasonable inference that the machinery in question was misadjusted, damaged, or poorly maintained, where there is no evidence to support it. Therefore, Griffin's proffer of evidence did not meet her burden of establishing direct

evidence under the "specific-defect" test that the Hertzian Conoid was present when the bottle left the manufacturer.

Even applying the more lenient "malfunction" test, Griffin failed to meet her burden on the third prong. Again, the third element of the "malfunction" test required Griffin to show "the absence of evidence of reasonable secondary causes which would eliminate liability of the defendant." *Farmer*, 97 Idaho at 747, 553 P.3d at 1311. Goldman's report does the opposite of what was needed for Griffin's case to survive summary judgment: it provides compelling evidence of reasonable secondary causes of the Hertzian Conoid that eliminate Antinori and Ste. Michelle from liability. Goldman's report concluded that S&C's distribution practices and handling methods created a "*hazardous condition*." Goldman pointed to two instances during S&C's distribution and handling practices where a Hertzian Conoid could occur. Moreover, Goldman opined that Albertson's method of restocking wine was "*abusive*" because it routinely dumped filled bottles "neck-down" into boxes already holding other filled bottles standing "neck-up." Goldman stated that this practice is known to cause a Hertzian Conoid. Additionally, Albertson's records showed it received a replacement bottle of wine (Wayfarer Pinot Noir) from S&C on the same day as Griffin's incident due to another broken bottle.

We conclude that the portions of Goldman's opinion about Antinori causing the Hertzian Conoid were pure speculation. "[T]he nonmoving party cannot rely on mere speculation, and a scintilla of evidence is insufficient to create a genuine issue of material fact." *Bollinger v. Fall River Rural Elec. Co-op., Inc*., 152 Idaho 632, 637, 272 P.3d 1263, 1268 (2012). Using Goldman's "more likely than not" standard, his report essentially concludes that the defect was likely caused by S&C and/or Albertson's. Griffin contends she satisfied this element because she ruled out all secondary causes of her own doing and narrowed it down to the defendants *in the chain of distribution*. This contention goes against *Farmer's* original intent, which, as *Farmer* explained, relevant to the third element of the "malfunction" test is: "the fact that the source of the malfunction is an enclosed system relatively immune from tampering or alteration once the product leaves the manufacturer's control." *Farmer*, 97 Idaho at 748, 553 P.2d at 1312. This system was not "enclosed"; to the contrary, it extended from the bottling plant in Italy over thousands of miles, an intervening ocean, and two continents before it was conveyed to a grocery store in Idaho, with plenty of intervening handlers in between.

Nevertheless, Griffin asserts that the Idaho Products Liability Reform Act (IPLRA), Idaho Code sections 6-1401–1410, adopted four years after *Farmer*, alters the analysis of this question. Specifically, Griffin argues that *Farmer's* reliance on an "enclosed system" factor has been supplanted by the "comparative responsibility" analysis contained in Idaho Code section 6-1404 and 6-1405(4). Section 6-1404 provides:

> Comparative responsibility shall not bar recovery in an action by any person or his legal representative to recover damages for product liability resulting in death or injury to person or property, if such responsibility was not as great as the responsibility of the person against whom recovery is sought, but any damages allowed shall be diminished in the proportion to the amount of responsibility attributable to the person recovering.

This language addresses cases where the comparative responsibility between the injured party and the parties alleged to be responsible are apportioned in order to ascertain the proportionate amount of damages to which the plaintiff may be entitled. It does not pertain to the quantum of proof needed to bring a product liability claim.

Section 6-1405 addresses the type of conduct giving rise to comparative responsibility. It sets forth four different types of conduct by either a claimant or a nonclaimant: (1) "[f]ailure to discover a defective condition"; (2) "[u]se of a product with a known defective condition"; (3) "[m]isuse of a product"; and (4) "[a]lteration or modification of a product." Idaho Code § 6-1405. Griffin focuses on the fourth factor, "alteration or modification," and argues that the following language switches the burden of proving where the defect arose from the claimant to the seller:

> (a) "Alteration or modification" occurs when a person or entity other than the product seller changes the design, construction, or formula of the product, or changes or removes warnings or instructions that accompanied or were displayed on the product. *"Alteration or modification" of a product includes the failure to observe routine care and maintenance,* but does not include ordinary wear and tear.
>
> (b) When *the product seller proves*, by a preponderance of the evidence, that an alteration or modification of the product by the claimant, or by a party other than the claimant or the product seller has proximately caused the claimant's harm, the claimant's damages shall be subject to reduction or apportionment to the extent that the alteration or modification was a proximate cause of the harm.

Idaho Code § 6-1405(4)(a) and (b) (emphasis added).

Griffin argues that the language in section 6-1405(4)(b) effectively shifts the burden of proof from Griffin and places it on Antinori to show that an alteration or defect caused by "the

31

failure to observe routine care and maintenance" was caused by another entity outside of its enclosed system (i.e., mishandling of the bottle by S&C and Albertson's). However, this argument misses the point of section 6-1405 and ignores the effect of Goldman's report. Antinori did not need to put on additional evidence to prove that the alteration or defect occurred outside its enclosed system when such evidence was supplied by Griffin's own expert.

As discussed above, Goldman's conclusions were based on his observations, reached to a "reasonable degree of engineering certainty," that more likely than not (1) S&C's "practice of distributing wine in less-than-case quantities and their handling methods for less-than-case orders created a hazardous condition," and (2) "bottle handling during wine restocking at the Albertson's in Hailey, Idaho continues to be abusive." Regarding Antinori, Goldman only generally opined that "there are numerous areas in a winery" which can cause a Hertzian Conoid fracture in the glass. Importantly, while noting that if "misadjusted, damaged, or poorly maintained, each of [the identified] points of contact [in Antinori's filling process] have the potential to damage the top of the finish," Goldman could not say "to a reasonable degree of engineering certainty that more likely than not" this occurred. Such a generic assessment of responsibility could conceivably apply to the manufacturer of any product—i.e., if the machinery used to produce rubber bands was not properly maintained or adjusted, it could result in a defective rubber band. Of the 16 "professional opinions" Goldman sets forth in his report, none identified any *actual* fault on the part of Antinori; he merely speculated as to what *might* happen if Antinori's equipment malfunctioned. Thus, Goldman's statements regarding Antinori's production practices provide no basis to conclude that Antinori shares any comparative fault, and there is no reason why Antinori could not rely on the same evidence to assert it was not at fault. Unlike the documented instances of S&C and Albertson's mishandling wine bottles, there were no examples of Antinori's machinery being maladjusted, damaged, or poorly maintained. Put simply, Goldman's opinion not only negates Griffin's ability to show Antinori's actions amount to comparative fault for the defect in the bottle, it also simultaneously provided Antinori with evidence that the comparative fault rests with S&C and Albertson's.[11]

---

[11] Notably, Griffin did not address the following exclusionary language contained at the end of section 6-1405(4)(b):
> This subsection shall not be applicable if:
> > 1. The alteration or modification was in accord with the product seller's instructions or specifications;

Similarly, Griffin references the Restatement (Second) of Torts to support shifting the burden to Antinori to show it was not the cause of the defect:

> Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm.

Restatement (Second) of Torts, § 433B(3) (1965). This Court has not previously addressed Section 433(B) of the Restatement; however, it was generally discussed by the Court of Appeals in *Fouche v. Chrysler Motors Corp.*, 103 Idaho 249, 252, 646 P.2d 1020, 1023 (Ct. App. 1982). Although we have not specifically adopted this provision, we have adopted similar provisions from the Restatement concerning products liability. *See, e.g. Shields v. Morton Chem. Co.*, 95 Idaho 674, 676, 518 P.2d 857, 859 (1974) ("An examination of what appears to us to be the better reasoned cases leads us today to the adoption of the rule of strict liability in tort as it appears in The Restatement of the Law, Torts 2d, s 402A (1965))."

Notwithstanding the language of the Restatement, the record in this case provided ample evidence to support the district court's decision to grant summary judgment to Antinori. Here, although Goldman positively identified the practices of two of the three actors as responsible for her injury to a "reasonable degree of engineering certainty," he could not say the same about Antinori. Thus, Griffin's own expert provided competent evidence in the record that Antinori did not cause the harm.

Accordingly, this Court affirms the district court's decision to grant summary judgment in favor of Antinori and Ste. Michelle and to dismiss Griffin's claims against them. Under the "specific-defect" test, Griffin has not provided direct evidence to show that the Hertzian Conoid existed when it left Antinori or Ste. Michelle. While the district court did not explicitly analyze the "malfunction" test, Griffin failed here, too. Instead of eliminating secondary causes of the Hertzian Conoid, Griffin's testimony highlighted that the Hertzian Conoid was more likely than

---

2. The alteration or modification was made with the express or implied consent of the product seller; or
3. The alteration or modification was reasonably anticipated conduct, and the product was defective because of the product seller's failure to provide adequate warnings or instructions with respect to the alteration or modification.

Griffin has pointed to nothing in the record suggesting that the mishandling of the bottle by S&C and Albertson's was consistent with Antinori's instructions, expressly or impliedly consented to by Antinori, or reasonably anticipated conduct. Thus, there is no reason to conclude that the district court erred in its ultimate conclusion.

not caused by S&C and/or Albertson's. In other words, Griffin failed to eliminate reasonable secondary causes of the defect. Therefore, we affirm the district court's grant of summary judgment and dismissal of Griffin's case against Antinori and Ste. Michelle.[12]

**D. The district court did not err in declining to address Griffin's late motion to compel discovery against Antinori and Ste. Michelle before rendering its decision on summary judgment.**

Griffin contends the district court erred in granting summary judgment before her motion to compel was resolved. Griffin moved to compel Antinori and Ste. Michelle to respond to Griffin's requests regarding whether any similar bottle breakages had occurred. Griffin argues that both Antinori and Ste. Michelle delayed fully responding to this request adequately for over one year.

Griffin served four sets of discovery requests upon Antinori and Ste. Michelle on May 15, 2018; July 10, 2018; August 13, 2018; and June 28, 2019. Griffin alleges that Antinori and Ste. Michelle "dodged" her discovery requests for well over one year. However, Griffin waited to file a motion to compel discovery until September 30, 2019. This occurred over one month *after* the district court had heard oral arguments regarding Antinori's and Ste. Michelle's motions for summary judgment, and two months *after* the motion for summary judgment was originally filed. Griffin did not raise the discovery issue in her written response to summary judgment or at oral argument. *See* I.R.C.P. 56(d) (explaining that the court may defer considering a motion for summary judgment and allow additional discovery if the nonmovant shows "it cannot present facts essential to justify its opposition."). Furthermore, due to Griffin's extremely late motion, her motion to compel was not noticed to be heard until one week after the district court issued its decision on summary judgment.

We hold that the district court did not abuse its discretion by failing to consider Griffin's motion to compel *before* issuing its decision on summary judgment. Bluntly put, Griffin's motion to compel was far too late and Griffin failed to timely seek relief under Rule 56(d) when the motion for summary judgment was filed. Even though Griffin alleged Antinori and Ste. Michelle "dodged" her discovery requests for one year, Griffin did not move to compel until well

---

[12] This result necessarily dismisses Griffin's alternative argument that Ste. Michelle had a duty to inspect the bottle because Griffin has not shown the defect was present when it left Antinori, the winery that placed the wine into the bottle. We also recognize that this ruling, by implication, will likely have an impact on Griffin's ability to pursue her remaining claims against Zignago, which have not yet been addressed on the merits. Nevertheless, those issues will need to be litigated by the parties on remand.

after the summary judgment motion was filed, briefs had been submitted, and oral argument had taken place. In fact, the motion for summary judgment was already under advisement for one month before Griffin moved to compel. After the district court granted Antinori's and Ste. Michelle's motions for summary judgment, Griffin's motion became moot when she failed to seek reconsideration. Therefore, the district court did not abuse its discretion by declining to address Griffin's motion to compel before rendering its decision on summary judgment.

## VI. CONCLUSION

In conclusion, this Court holds that the correct test when determining personal jurisdictional issues remains the "stream of commerce" test adopted by the United States Supreme Court in *World-Wide Volkswagen*. Applying that test to the case here, we reverse the district court's decision to grant Zignago's motion to dismiss for lack of personal jurisdiction and remand the case for further proceedings consistent with this opinion. Costs on appeal, as a matter of course, are awarded to Griffin against Zignago for prevailing in her appeal on the issue of personal jurisdiction.

We affirm the district court's decision granting Antinori's and Ste. Michelle's motions for summary judgment and hold that it did not abuse its discretion in failing to grant Griffin's motion to compel discovery against Antinori and Ste. Michelle. As the prevailing parties, costs on appeal are awarded as a matter of course to Antinori and Ste. Michelle.

Chief Justice BEVAN, and Justices BRODY, STEGNER and BURDICK **CONCUR.**